## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMAD MOKHTAR AHMED,<br><br>*Plaintiff*,<br><br>v.<br><br>CHARLES H. KABLE, IV, et al.,<br><br>*Defendants*. | Civil Action No. 21-3333 (TJK) |

## MEMORANDUM OPINION & ORDER

Plaintiff's pro se complaint sketches an opaque, dreamlike narrative that spans about twenty years of his life. It recounts varied perceived invasions of his rights—ranging from his long-ago pretrial detention in the military justice system, to his more-recent inability to eat at the airport restaurant of his choice, and to a federal agency's purported refusal to release records under the Freedom of Information Act. The most colorable claim the Court can discern from his filings is that the government put him in the Terrorist Screening Dataset without due process of law.

Defendants move to dismiss. The Court agrees that, even liberally construed, Plaintiff's complaint largely fails to establish subject-matter jurisdiction and, in remaining part, to plausibly state a claim for relief. Thus, the Court will grant Defendants' motion and dismiss Plaintiff's complaint. But it will also give Plaintiff an opportunity to amend his complaint in response to the Court's order because it cannot rule out the possibility that further allegations—targeted at the claims the Court recognizes as within its jurisdiction—could cure some of the complaint's defects.

### I.     Background

Because the Court is resolving a motion to dismiss, it draws the facts below from Plaintiff's allegations, which the Court assumes are true insofar as they are plausible and not conclusory.

A.      **Facts**[1]

Plaintiff enlisted in the U.S. Marine Corps in 1998.  ECF No. 1 ("Compl.") ¶ 15.  Plaintiff's performance exceeded expectations, and the Corps promoted him and gave him special assignments.  *See* Compl. ¶¶ 48–51.  After a few years, the Corps stationed him in Quantico, Virginia. *See* Compl. ¶ 53.  Again, he performed his duties well.  *See* Compl. ¶¶ 53–54.

While at Quantico, Plaintiff served under the command of two Corps officers relevant to this case.  The first is then-Captain David Banning; the second is then-Major Donald Davis.  *See generally* Compl. ¶¶ 54–70.  Plaintiff named both men as defendants.  *See* Compl. at 2, ¶¶ 19, 21. Captain Banning spoke abusively to Plaintiff, including by disparaging his ethnicity, and treated him roughly.  *See* Compl. ¶¶ 55–59.  So Plaintiff asked to be transferred.  *See* Compl. ¶ 58.  Captain Banning transferred Plaintiff to Major Davis's command.  *Id.*  But Major Davis also made disparaging remarks about Plaintiff's ethnicity and religion.  *See* Compl. ¶ 61.

Plaintiff attributes interactions with the military justice system to both officers.  First, he says "Captain Banning was trying to frame him with bogus charges."  Compl. ¶ 55.  Apparently as part of that effort, Captain Banning directed Plaintiff to "get fingerprinted," which Plaintiff describes as "the first time the government was able to obtain [his] biometrics."  *See* Compl. ¶¶ 55, 59 (emphasis omitted).  Captain Banning also tried unsuccessfully to "intimidate[ ]" Plaintiff into signing statements falsely acknowledging Plaintiff's guilt of unspecified crimes.  *See* Compl. ¶ 55. Then, under Major Davis's command, military police arrested Plaintiff in early 2001.  *See* Compl.

---

[1] As the Court noted above, Plaintiff's complaint is disjointed and difficult to follow, not least because its narrative is non-chronological.  As Plaintiff himself put it, his complaint seeks "redress from *de facto* government policies[ ] from almost two decades of abuse with no opportunity for due process."  ECF No. 19 ("Pl.'s Br.") ¶ 9.  Thus, it seems, his complaint is organized around that theme.  What follows is the Court's attempt to reconstruct a linear narrative from Plaintiff's complaint, "Motion for Mandamus," ECF No. 3, brief in opposition to Defendants' motion to dismiss, and exhibits to those filings.

¶ 61.  Plaintiff does not explain the purported basis of that arrest.  He attributes it to Major Davis's ethnic and religious animus.  *See* Compl. ¶ 61.

Military police detained Plaintiff for two months.  Compl. ¶ 62.  Plaintiff describes the conditions he faced in detention as "harsh[ ]," Compl. ¶ 67, "illegal," Compl. ¶ 69, "solitary confinement," Compl. ¶ 61, and as "maximum detainment," *id.*  He thus compares his case to those of others detained around the same time.[2]

Plaintiff barely intimates the outcome of those proceedings.  He notes that a preliminary hearing was "botched," *see* Compl. ¶ 70, suggests that Major Davis's testimony did not go well for the prosecution, *see* Compl. ¶ 60, and says his lawyer "expose[d]" the weaknesses in the prosecution's case, *see* Compl. ¶ 61.  Thus, he apparently was released.  *See* Compl. ¶¶ 62, 70.  Ultimately, the Marine Corps honorably discharged Plaintiff in 2002.  Compl. ¶ 15.

But Plaintiff attributes two lasting, tangible consequences to that episode.  First, he suggests that Banning and Davis (although the latter was no longer serving as a Marine Corps officer) submitted his information to the Terrorist Screening Dataset.  *See* Compl. ¶¶ 19, 21, 70.  Thus, Plaintiff believes racism and religious animus motivated his inclusion there.  *See* Compl. ¶¶ 34–35.  Second, Davis arranged some kind of ongoing harassment against Plaintiff, incidents about which Plaintiff has not provided further detail except that someone "unlawfully entered his home."  *See* Compl. ¶ 70; Pl.'s Br. ¶ 44.[3]

---

[2] *See* Compl. ¶¶ 62–63, 69; ECF No. 1-1 at 75–117 (Daniel King); Compl. ¶¶ 65–66; ECF No. 1-1 at 118–22 (Wayne McKenzie); Compl. ¶ 67 (Chelsea Manning); Compl. ¶ 70; ECF No. 1-1 at 123–26; ECF No. 19-1 at 68–85 (Affraz Mohammed).

[3] Plaintiff possibly means to reference parallel litigation proceeding in the Eastern District of New York.  *See* Compl. ¶¶ 98–99; ECF No. 1-1 at 147–162; *Ahmed v. Miller*, 1:21-CV-6086 (RPK/SJB) (filed Oct. 20, 2021).  In that case, as Magistrate Judge Bulsara summarized it, Plaintiff alleges that NYPD officers unlawfully detained and searched him, photographed him, and sexually

The first consequence lies at the heart of this case. The Terrorist Screening Dataset ("TSD")[4] "is the federal government's consolidated watchlist of known or suspected terrorists." *Elhady v. Kable*, 993 F.3d 208, 213 (4th Cir. 2021).[5] The Terrorist Screening Center ("TSC") maintains it in coordination with several other agencies. *See id.* Some federal agencies may nominate a person for inclusion in the dataset, and TSC evaluates those submissions and decides whether inclusion is appropriate. *See id.* at 214. Nominations may include many "personal characteristics and features," but Plaintiff believes only a name and date of birth are truly required. *See* Pl.'s Br. ¶ 31. Only the TSC may modify an entry in the TSD. *See* Pl.'s Br. ¶ 35.

As relevant here, the Transportation Security Administration ("TSA") uses the TSD "to screen airline passengers." *Elhady*, 993 F.3d at 214. For that purpose, inclusion in the TSD is divided into at least three categories. *Id.*; *see also* Pl.'s Br. ¶ 27. The highest category is the no-fly list, which prevents named individuals "from boarding commercial flights on U.S. carriers and flights through U.S. airspace." *Elhady*, 993 F.3d at 214. Below that is the selectee list, which subjects named individuals merely to "enhanced screening." *See id.* The third category is the expanded selectee list, which functions like the selectee list but has different criteria. *See id.* The government does not disclose whether an individual is included in the TSD at all, let alone whether an individual is on the no-fly list or either of the selectee lists. *See id.* at 215.[6]

---

harassed him in August 2018, which was somehow connected to his inclusion in the Terrorist Screening Dataset. *See id.*, ECF No. 37 at 2–3 & n.4.

[4] The government previously called the Terrorist Screening Dataset the Terrorist Screening Database, which is the term the parties' briefing uses. *See* ECF No. 15-1 at 2 n.1; Pl.'s Br. ¶ 8.

[5] Plaintiff attached both District Judge Trenga's opinion, ECF No. 1-1 at 2–33, and the Fourth Circuit's opinion, ECF No. 1-1 at 35–72, in *Elhady v. Kable* as exhibits to his complaint.

[6] It is, however, possible for a person on the no-fly list to confirm that fact if she files an administrative redress inquiry. *See, e.g.*, *Busic v. TSA*, 62 F.4th 547, 549 (D.C. Cir. 2023).

The TSD scheme includes ostensible procedural safeguards on both the front and back ends. On the front end, nominating agencies "must have internal procedures to prevent errors in [their] nominations and must annually review [their] nominations of all U.S. . . . citizens and lawful permanent residents." *Elhady*, 993 F.3d at 215. On the back end, "travelers who believe they have been delayed or prohibited from boarding a commercial aircraft because they have been wrongly identified as a threat" can seek redress from the TSA's Traveler Redress Inquiry Program ("TRIP"). *See id.*[7] As part of that inquiry, if applicable, the government can "reassess whether [the complainant] belongs in the [TSD]." *See id.* Plaintiff, however, believes the government does not adhere to those procedures. *See* Compl. ¶¶ 87, 90, 94, 96; Pl.'s Br. ¶ 38.

Plaintiff alleges that his information is included in the TSD and that he is on the selectee list. Pl.'s Br. ¶ 8. Although the government has never confirmed his suspicions, he has so concluded because of "the totality of the circumstances" that follow. *See id.*

After his discharge from the Marines, Plaintiff worked various jobs in the private sector. *See* Compl. ¶¶ 100–119. During that time, he visited a friend's son in jail in New York. Compl. ¶ 106. But to do that, he "had to endure extra judicial strip searches that reminded him of his wrongful incarceration." *Id.* (emphasis omitted). He also had lingering "symptoms from solitary confinement and the unlawfulnesses [*sic*] thereafter." Compl. ¶ 104. The U.S. Department of Veteran's Affairs has diagnosed Plaintiff with "chronic diseases and symptoms," Compl. ¶ 16, such as tinnitus, Compl. ¶ 57. Thus, he "became extremely depressed and hopeless . . . and eventually became homeless." Compl. ¶ 107.

As part of the harassment he says he experienced in New York, Plaintiff references an

---

[7] *See also* Dep't of Homeland Sec., *DHS Traveler Redress Inquiry Program (DHS TRIP)*, https://perma.cc/D8RU-5AJS.

incident in which he believes FBI Special Agent George Keller, a defendant here, violated his rights in 2018. *See* Compl. ¶ 98. He describes that incident in his First Amended Complaint in another case in the Eastern District of New York. *See Ahmed v. Miller*, 1:21-CV-6086 (RPK/SJB) (filed Oct. 20, 2021), ECF No. 25 ¶¶ 58–65. In short, Special Agent Keller searched Plaintiff's residence in a way Plaintiff believes was illegal. *See id.*

Because of that incident and others, Plaintiff submitted a Freedom of Information Act ("FOIA") request to the FBI in January 2020. *See* Compl. ¶ 98; ECF No. 1-1 at 134–43. Plaintiff asked the FBI to expedite that request. *See* Compl. ¶ 98. The FBI denied his request for expedited processing, saying he had "not provided enough information concerning the statutory requirements permitting expedition." ECF No. 1-1 at 135. By October 2021, the FBI had not processed his request. *See id.* at 139–43. When Plaintiff asked for an estimate of expected processing time, an agency representative told him that, depending on a request's complexity, processing times average between 152 and 2,360 days. *See id.* at 141. Plaintiff interpreted that to mean that his request "will be completed in over 2,000 days" and cannot be expedited. *See* Compl. ¶ 98.

Around the same time, Plaintiff experienced travel difficulties on a trip to Spain. While waiting in line to check in for his flight in the Madrid airport, airport staff surrounded him and began questioning him about his purpose for traveling. *See* Compl. ¶ 73. Staff marked his passport with an "SSSS" sticker and ordered him not to remove it. *See* Compl. ¶¶ 74–75. That sticker meant he was subject to enhanced screening, which could be because Plaintiff was on the TSD selectee list, or it could be because he was randomly selected for more screening. *See* Pl.'s Br. ¶ 8; *see also Ghedi v. Mayorkas*, 16 F.4th 456, 460 (5th Cir. 2021) ("[P]assengers might have an SSSS printed on their boarding passes due to inclusion on the Selectee List, random selection, or reasons unrelated to any [TSD] status."). Plaintiff then heard his named called over the airport

intercom system, directing him to report for enhanced screening.  *See* Compl. ¶ 76.

When he reported for that screening, Plaintiff "became argumentative and immediately called" a U.S. Senator's office.  *See* Compl. ¶ 76.  In response, airport staff "threatened [him] with arrest and jail if he did not comply."  *See id.*  During the search, a translator told Plaintiff, "This is your government!  Not us!"  *See* Compl. ¶ 77 (emphasis omitted).

Plaintiff apparently cleared the search and proceeded to the gate.  But there, he encountered a man "with a strong build and military resemblance" who he thinks was a Federal Air Marshal.  *See* Compl. ¶ 78.[8]  That man spoke to Plaintiff and others even though Plaintiff had not "[ ]solicited" conversation.  *See* Compl. ¶¶ 78–80.  Plaintiff declined to speak with the man, *see id.*, and then told him "legal action would be taken if civil rights were violated," Compl. ¶ 81.  From that point, the man "became silent."  *See id.*  But he remained "within arm length [*sic*] distance blocking free movement[ ] until . . . Plaintiff got to his seat."  *See* Compl. ¶ 81.

Plaintiff experienced further problems on his return to JFK International Airport in New York.  Then, as happens every time he returns to the United States from abroad, he was subjected to "prolonged detention," which he calls "Secondary Screening."  *See* Compl. ¶ 83.  Specifically, a customs official directed him to "state his social security number in front of others."  Compl. ¶ 84.  Officials also treated him disrespectfully in mostly unspecified ways.  *See* Compl. ¶¶ 86–88.  And he had to wait "for hours" with "no phone."  *See* Compl. ¶ 88 (emphasis deleted).  Plaintiff believes his experiences reflect poor training practices on the part of Defendant Troy Miller, the Acting Commissioner of U.S. Customs and Border Protection.  *See* Compl. at 3, ¶ 88.

From those travel-related incidents, Plaintiff identifies three consequences.  First, his travel

---

[8] Plaintiff listed this person as an anonymous defendant.  *See* Compl. at 3 ("Unidentified Alleged Federal Air Marshal" (capitalization altered)).

was delayed, and during those delays, his ability to move freely was impeded.  *See* Compl. ¶¶ 81, 83, 87–89.  Second, he felt stigmatized and degraded by officials' publicly treating him rudely and, in his words, as an "International Terrorist[ ]."  *See* Compl. ¶¶ 71, 76–77, 81, 84, 86.  Third, in the Madrid airport, he was unable to eat "crispy potato wedges offered at Burger King" that are "not offered in the Burger Kings in the United States."  *See* Compl. ¶¶ 81–82.  Because of the presence of the man he thinks was a Federal Air Marshal, that is, Plaintiff was "depriv[ed] of this [b]enefit of being in Spain," a "protected liberty interest."  *See id.*

Thus, Plaintiff filed a TRIP inquiry.  *See* Compl. ¶¶ 11, 85.  The agency responded: "[W]e have determined that [Plaintiff's inquiry] falls outside the scope of the DHS TRIP program because it does not state any travel difficulties that [Plaintiff has] experienced.  We closed the matter, and sent a decision letter on [January 31, 2020]."  Pl.'s Br. ¶ 74; ECF No. 1-1 at 127.

A few months later, Plaintiff lost some personal property.  *See* Compl. ¶99.  As he put it in his Eastern District of New York case, Plaintiff was "encamping" in an office in Brooklyn during the early months of the COVID-19 pandemic.  *See Ahmed v. Miller*, 1:21-CV-6086 (RPK/SJB) (filed Oct. 20, 2021), ECF No. 25 ¶ 68.  But the company that owned that property evicted him and confiscated his belongings, including his birth certificate and passport.  *See id.*  Plaintiff says this incident arose "from" his interactions with Special Agent Keller and the NYPD, but he does not further explain that connection.  *See* Compl. ¶¶ 98–99.

At some point after his trip to Spain, Plaintiff applied for benefits from the U.S. Department of Veterans Affairs ("DVA").  Plaintiff told a department administrator about his travel problems, and in response, she asked if Plaintiff had "been taking his medicine."  *See* Compl. ¶ 122.  After that, Plaintiff "stayed silent" and then "asked for another counselor."  *See* Compl. ¶¶ 122–23.  He then repeated that request later by email.  *See* Compl. ¶ 123.  Although his requests were initially

ignored, he eventually had a second interview. *See id.* But at that interview, his request was denied based on "information that was previously entered in [his] medical file." *See id.* Plaintiff believes DVA administrators accessed information in the TSD. *See* Compl. ¶ 125. He says they found him "entitled" to the benefits he sought but denied him anyway because of "words in the database." *See id.* Separately, a DVA administrator accused him of "race-baiting." *See* Compl. ¶ 124.

Plaintiff believes the TSD contains detailed information about at least some listed individuals, including their medical information. *See* Compl. ¶¶ 38, 97. Information in the database is available to "various participating agencies." *See* Pl.'s Br. ¶ 52 (quotation omitted). The FBI, Plaintiff says, also "charges monetary fees and dues for [TSD] queries." Pl.'s Br. ¶ 62. In 2021, 1.9 million TSD records were exposed in a data breach, and it is unclear "whether any unauthorized parties accessed" that information. *See* Pl.'s Br. ¶¶ 87–88 (quotation omitted).

Finally, regarding his ability to litigate this case, Plaintiff has "symptoms and impairments that require accessibility." ECF No. 3 ¶ 1. Specifically, he needs the Court's website to read text aloud. *See id.* at 2–3 ¶¶ 2–8. The Court's website has such a feature generally, but it does not work for text embedded in .pdf files. *See id.* at 3 ¶¶ 4–6. Plaintiff believes that feature's absence constitutes a violation of a "clear non-discretionary duty for equitable access to the US Courts websites and for accessibility of such websites for equitable due process." *Id.* at 4 ¶ 1.

### B.    Procedural History

Plaintiff brought this case against the Director of the TSC and many other federal officials, alleging a litany of constitutional and statutory claims. *See generally* ECF No. 1. He seeks various relief, including money damages, injunctions, writs of mandamus, declaratory judgments, attorney's fees, and costs. *See id.* at 52–67. Defendants move to dismiss. *See* ECF No. 14. They argue that some of Plaintiff's claims lie outside the Court's subject-matter jurisdiction, ECF No. 15-1 at 9–12, and that he has failed to state claims in any event, *see id.* at 12–36.

## II.      Legal Standards

Defendants' motion relies on Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Under Rule 12(b)(1), Plaintiff has the burden to establish the Court's subject-matter jurisdiction. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).  That burden includes the obligation to show standing, *Little v. Fenty*, 689 F. Supp. 2d 163, 166–67 (D.D.C. 2010), which "grows heavier at each stage of the litigation," *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015).  To survive a motion to dismiss, Plaintiff need only allege a qualifying "injury resulting from [Defendants'] conduct."  *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

In evaluating a Rule 12(b)(1) motion, the Court must "assume the truth of all material factual allegations in the complaint and . . . grant[ Plaintiff] the benefit of all inferences that can be derived from the facts alleged."  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quotation omitted).  That is particularly true here because Plaintiff proceeds pro se; the Court must "liberally construe[ ]" his filings and hold him to a "less stringent standard."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  But he still has the burden to prove subject-matter jurisdiction. *Bickford v. United States*, 808 F. Supp. 2d 175, 179 (D.D.C. 2011).  In evaluating whether he has met that burden, the Court may consider the allegations in his complaint, the undisputed facts in the record, and, if necessary, its resolution of disputed facts.  *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).

Under Rule 12(b)(6), Plaintiff's complaint must "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).  A claim is plausible if "it contains factual allegations that, if proved, would allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quotation omitted). Again, the Court must "accept all the well-pleaded factual allegations of the complaint as true and

draw all reasonable inferences from those allegations in the plaintiff's favor." *Id.* (quotation omitted). But it must disregard "a legal conclusion couched as a factual allegation." *Cason v. NFL Players Ass'n*, 538 F. Supp. 3d 100, 109 (D.D.C. 2021) (quotation omitted).

In this respect, too, the Court must construe Plaintiff's complaint liberally because he proceeds pro se. *See Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017). And the Court must consider not only the facts in Plaintiff's complaint, but also those he presented in opposing Defendants' motion to dismiss. *See Watson v. D.C. Water & Sewer Auth.*, 249 F. Supp. 3d 462, 464 (D.D.C. 2017); *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015). Ultimately, though, a pro se plaintiff still must plausibly plead a claim to avoid dismissal. *See Odutola v. Branch Banking & Tr. Co.*, 321 F. Supp. 3d 67, 73 (D.D.C. 2018).

## III.   Analysis

Plaintiff's complaint mentions a host of legal authorities, and their relationship to his factual allegations is not always clear. The Court will "infer the claims made wherever possible," seeking to identify "all possible legal theories that could apply." *Davis v. United States*, 973 F. Supp. 2d 23, 26 (D.D.C. 2014).

Plaintiff's complaint names 13 defendants.[9] It suggests that he named those defendants in their official capacities only. *See* Compl. at 1–3, ¶¶ 5–28. But in responding to Defendants'

---

[9] Those defendants are Charles Kable (Director of the Terrorist Screening Center); Christopher Wray (Director of the FBI); David Banning (a Colonel in the Marine Corps); the U.S. Army's Criminal Investigation Division; Donald Davis (a County Manager for Jefferson County, Colorado, but at the time of his apparent involvement in Plaintiff's allegations, a Major in the Marine Corps); George Keller (an FBI special agent); John Doe (a Navy Criminal Investigative Service special agent); Lloyd Austin (Secretary of Defense); Alejandro Mayorkas (Secretary of Homeland Security); Troy Miller (Acting Commissioner of U.S. Customs and Border Protection); Unidentified Alleged Federal Air Marshal; Caryle Burke (Veterans Benefits Administrator at the Department of Veterans Affairs); and D'Laiga Francis-Abdullah (Vocational Rehabilitation and Employment Chief at the Department of Veterans Affairs). *See* Compl. at 1–3.

motion to dismiss, Plaintiff clarified that he intended to name Defendants in both their individual and official capacities.  *See* Pl.'s Br. ¶ 10.  Thus, the Court will consider both types of claims for each defendant.

For the following reasons, the Court concludes that it has subject-matter jurisdiction over five categories of Plaintiff's claims.  Yet Plaintiff has not plausibly pleaded those claims, and so the Court will dismiss his complaint in full.  For the most part, it will do so by granting Defendants' motion to dismiss, but it will dismiss Plaintiff's individual-capacity claims sua sponte.  Still, it is conceivable that Plaintiff could state some claims by pleading additional facts, so the Court will dismiss his complaint without prejudice and give him an opportunity to file an amended complaint that addresses the defects the Court identifies below.

### A.  The Court has Subject-Matter Jurisdiction over Some of Plaintiff's Claims

The Court must begin by ensuring that it has subject-matter jurisdiction.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  It has an "independent obligation in every case" to establish jurisdiction before proceeding to the merits.  *See United States v. Miranda*, 780 F.3d 1185, 1193 (D.C. Cir. 2015).  Thus, parties cannot forfeit arguments against the Court's subject-matter jurisdiction, and the Court is obliged to raise them sua sponte.  *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008).

One factor in determining the Court's subject-matter jurisdiction is sovereign immunity. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  A federal agency is immune from suit unless Congress says otherwise.  *See Loeffler v. Frank*, 486 U.S. 549, 554–55 (1988).  When a plaintiff sues a federal officer in her official capacity, the real party-in-interest is the United States.  *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).  Thus, sovereign immunity applies to such claims. *Clark v. Libr. of Congr.*, 750 F.2d 89, 103 (D.C. Cir. 1984).  So the Court's power to hear an official-capacity suit thus turns on whether the United States has consented to be sued.  *United*

*States v. Mitchell*, 463 U.S. 206, 212 (1983).  Such a waiver must be "unequivocally expressed in statutory text." *Lane v. Pena*, 518 U.S. 187, 192 (1996).

Another factor that determines the Court's subject-matter jurisdiction is Plaintiff's standing.  *See Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 186 (D.D.C. 2020).  That is, the Court must ensure Plaintiff has "clearly allege[d] facts demonstrating" he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (alteration adopted).

Plaintiff must establish standing "for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).  For backward-looking relief, a qualifying injury need only be "concrete and particularized." *Silver v. IRS*, 531 F. Supp. 3d 346, 358 (D.D.C. 2021).  But "past injury alone is not sufficient to merit the award of relief against future conduct." *Halkin v. Helms*, 690 F.2d 977, 1005 (D.C. Cir. 1982).  So claims for prospective declaratory and injunctive relief require "an ongoing or future injury that is certainly impending." *Fuentes v. Biden*, No. 21-CV-3106 (APM), 2023 WL 1070545, at *1 (D.D.C. Jan. 27, 2023) (quotation omitted).  Thus, claims for such relief "create[ ] a significantly more rigorous burden to establish standing." *Swanson Grp. Mfg. LLC v. Jewell*, 195 F. Supp. 3d 66, 77 (D.D.C. 2016).

### 1.   The Court Has Subject-Matter Jurisdiction over Some Claims Against Agencies and Official-Capacity Defendants

#### a.   Claims Seeking Money Damages

Plaintiff's complaint asserts wide-ranging entitlement to money damages.  *See* Compl. ¶ 120; *id.* at 60–67.  That request appears to apply to all official-capacity defendants.  Thus, he has the burden to prove "that the government has unequivocally waived its immunity." *See Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003).

For the most part, Plaintiff has not hinted at any candidate for such a waiver.  He mentions only two statutes that might apply to the bulk of his claims.  The first is the Administrative Procedure Act ("APA"), which he briefly cites for another purpose.  *See* Pl.'s Br. ¶¶ 82–83.  The APA contains a general waiver of sovereign immunity, but it applies only to "relief other than money damages."  5 U.S.C. § 702.  So it cannot help Plaintiff here.

The second statute Plaintiff invokes is the Federal Tort Claims Act ("FTCA").  That statute contains a more limited waiver of sovereign immunity.  *See generally Meyer*, 510 U.S. at 475–79.  But for one thing, Plaintiff explicitly disavows any intention to "invoke" the FTCA.  *See* Pl.'s Br. ¶ 91.  For another, by his own admission, the FTCA's waiver could possibly encompass only Defendants Banning and Davis.  *See id.*  And Plaintiff's allegations about both those defendants relate exclusively to their roles as his commanding military officers.  *See* Compl. ¶¶ 19, 21, 54–70.  Accordingly, those allegations fall outside the FTCA's scope in any event.  *See Schnitzer v. Harvey*, 389 F.3d 200, 202–06 (D.C. Cir. 2004) (explaining that the FTCA does not waive sovereign immunity for claims about injuries "incident to service" in the armed forces (quotation omitted)).

Plaintiff's claims under the Fair Credit Reporting Act ("FCRA") are the lone exception.  That statute, as the Circuit recently held, "waives federal sovereign immunity from its damages claims."  *Mowrer v. U.S. Dep't of Transp.*, 14 F.4th 723, 730 (D.C. Cir. 2021).  So sovereign immunity is no obstacle to Plaintiff's FCRA claims for damages.  For all other damages claims against agencies and official-capacity defendants, the Court will grant Defendants' motion to dismiss for lack of subject-matter jurisdiction.[10]

---

[10] Plaintiff also appears to assert a claim against Defendant Davis in his capacity as a *state* official.  *See* Pl.'s Br. ¶ 10.  Although the rationale is different, that claim terminates in the same place.  Damages claims against state officials in their official capacities are barred by Eleventh Amendment immunity unless Congress has validly abrogated that immunity.  *See Dougherty v.*

The question remains whether Plaintiff has established standing for his FRCA claims. To be concrete, and so cognizable in federal court, an FCRA injury must be more than a "bare procedural violation." *Spokeo*, 578 U.S. at 341. But the Court must assume that Plaintiff "is correct on the legal merits of his claim." *See Cutler v. HHS*, 797 F.3d 1173, 1179 (D.C. Cir. 2015). So assuming the statute operates as Plaintiff says it does, the question is whether he has attributed to FCRA violations injuries that are "physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts." *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2206 (2021). Examples include disclosure of harmful and misleading information to third parties, *see id.* at 2208–09, and "tangible, out-of-pocket expenses," *see Magruder v. Cap. One, Nat'l Ass'n*, 540 F. Supp. 3d 1, 9 (D.D.C. 2021).

Plaintiff has pleaded cognizable disclosure-based injuries attributable to FCRA violations. He alleges that the inclusion of his information in the TSD and its dissemination to third parties violate the FCRA. *See* Compl. ¶¶ 13, 97. And he accuses at least two defendants of putting inaccurate information about him in the TSD. *See* Compl. ¶¶ 19 (Banning), 21, 70 (Davis). That information was then available to many others, *see* Pl.'s Br. ¶ 52, including "all Defendants," *see* Compl. ¶ 40, foreign governments, *see* Compl. ¶ 71, and possibly others because of the data breach, *see* Pl.'s Br. ¶¶ 87–88.

Thus, assuming his factual allegations are true and that his legal interpretation of the FCRA is correct, Plaintiff has pleaded cognizable injuries attributable to violations of that statute, and so

---

*United States*, 156 F. Supp. 3d 222, 232–33 (D.D.C. 2016). Plaintiff identifies no statute that might do so for his claims against Davis arising from his actions as a state official, whatever those claims might be. And although Plaintiff could seek prospective relief for any prospective actions by Davis that would violate federal law, *see Miller v. Smith*, 952 F. Supp. 2d 275, 287 (D.D.C. 2013), Plaintiff has not pleaded any basis to conclude that any such acts are likely to occur, as the Court explains further below.

he has standing to bring those claims.  Below, the Court will consider whether he has pleaded a FCRA claim.[11]

### b.      Claims Seeking Administrative Remedies

Plaintiff's complaint also seems to request various administrative remedies.  For instance, he hints that the Court should address two discrete agency actions: the denial of his veterans benefits, *see* Compl. ¶¶ 121–25, and the resolution of his TRIP inquiry, *see* Compl. ¶ 85; Pl.'s Br. ¶¶ 82–83.[12]  He also seeks an order directing the release of agency records, *see* Compl. at 65, and a writ of mandamus directing the Administrative Office of the U.S. Courts to implement a new website-accessibility feature, *see* ECF No. 3.

On those claims, the APA's waiver of sovereign immunity takes Plaintiff further.  Again, it waives sovereign immunity for claims against agencies "or an officer or employee thereof" for "relief other than money damages."  5 U.S.C. § 702.  That waiver "applies to any suit whether under the APA or not."  *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).  And even though Plaintiff's veterans'-benefits claim is a claim for money, that does not mean it is a claim for money *damages*.  In this Circuit, "money damages" under the APA means "compensatory relief"—not "specific relief," regardless of its form.  *Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441, 1447–48 (D.C. Cir. 1985).  In other words, the APA's waiver of sovereign immunity applies to claims asserting "specific legal entitlement to particular monies." *McKoy v. Spencer*, 271 F. Supp. 3d 25, 33 (D.D.C. 2017).  That is the nature of Plaintiff's

---

[11] The Court does not deny Defendants' motion in this respect because Defendants do not argue that the Court lacks subject-matter jurisdiction over Plaintiff's FCRA claims.  *See* ECF No. 15-1 at 9–12.

[12] As the Court explains further below, it lacks subject-matter jurisdiction over a claim to compel a decision on Plaintiff's TRIP inquiry for reasons unrelated to its sovereign-immunity and standing analysis in this section.  *See infra* Section III.B.3.b.

veterans'-benefits claim—entitlement to a specific financial benefit.  *See* Compl. ¶ 125.

There is, however, another jurisdictional problem with Plaintiff's claim related to the denial of his veterans' benefits.  Congress has precluded federal district courts from exercising jurisdiction over such claims.  38 U.S.C. § 511(a).  "The exclusive avenue for redress of veterans' benefits determinations is appeal to the Court of Veterans Appeals and from there to the United States Court of Appeals for the Federal Circuit."  *Price v. United States*, 228 F.3d 420, 421 (D.C. Cir. 2000).  And "a federal district court may not entertain constitutional or statutory claims whose resolution would require the court to intrude upon the VA's exclusive jurisdiction."  *Id.* at 422.  Thus, the Court must dismiss Plaintiff's complaint sua sponte for lack of subject-matter jurisdiction insofar as it seeks such relief.

Moreover, the APA's waiver of sovereign immunity does not extend to the Administrative Office of the U.S. Courts.  The term "agency" as defined by the APA does not include "the courts of the United States."  5 U.S.C. § 701(b)(1)(B).  And the Administrative Office sits "within the Judicial Branch."  *See Guffey v. Mauskopf*, 45 F.4th 442, 444 (D.C. Cir. 2022).  Thus, its "actions are not subject to judicial review under the terms of this waiver."  *Muirhead v. Mecham*, 427 F.3d 14, 18 (1st Cir. 2005).

Nor does Plaintiff's substantive legal authority for his claim provide a relevant waiver of sovereign immunity.  He cites the Rehabilitation Act of 1973, codified at 29 U.S.C. § 701 *et seq.* *See* ECF No. 3 at 1.  True, the Rehabilitation Act waives sovereign immunity for some claims. *See generally Williams v. Perdue*, 386 F. Supp. 3d 50, 54 (D.D.C. 2019).  But it generally "does not cover judicial branch agencies," and so the Administrative Office is not "within the ambit of the Rehabilitation Act."  *See Hollingsworth v. Duff*, 444 F. Supp. 2d 61, 64–68 (D.D.C. 2006). Indeed, the specific provision of the Rehabilitation Act Plaintiff cites applies to "each Federal

department or agency, including the United States Postal Service." *See* 29 U.S.C. § 794d(a)(1)(A). That language does not, in "ordinary parlance," describe the judicial branch. *See Hubbard v. United States*, 514 U.S. 695, 699 (1995). Accordingly, that part of the Rehabilitation Act does not contain the unmistakable clarity needed to abrogate sovereign immunity. *See Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 143 S. Ct. 1689, 1695 (2023).

Neither the Mandamus Act, *see* 28 U.S.C. § 1361, nor the All Writs Act, *see id.* § 1651, help Plaintiff here either. Those statutes do not waive sovereign immunity. *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (Mandamus Act); *Reading v. United States*, 506 F. Supp. 2d 13, 20 (D.D.C. 2007) (All Writs Act).

Thus, Plaintiff's claim against the Administrative Office of the U.S. Courts is barred by sovereign immunity. The Court will dismiss his complaint sua sponte for lack of subject-matter jurisdiction insofar as it asserts that claim.

Defendants also challenge part of Plaintiff's FOIA claim on standing grounds. *See* ECF No. 15-1 at 11. That challenge is based on the second and third prongs of the standing test: causation and redressability. *See id.* Defendants point out that Plaintiff's FOIA claim asserts entitlement to records in the FBI's custody, *see* Compl. at 65, and so they say no defendant other than Defendant Wray, the FBI Director, could have caused Plaintiff's injury or could remedy it, *see* ECF No. 15-1 at 11.

In substance, the Court agrees. But Plaintiff's FOIA claim appears to relate only to Defendant Wray in any event. *See* Compl. at 65 (asking the Court to "[c]ompel Defendant FBI Director Christopher Wray . . . to [r]elease" Plaintiff's FOIA requests). Still, even Defendant Wray is not the proper defendant for a FOIA claim, which can be brought only against the custodial agency itself. *See Isasi v. Jones*, 594 F. Supp. 2d 1, 4 (D.D.C. 2009). Because Plaintiff, proceeding

pro se, named officers of the FBI and provided enough information for the Court to glean that he seeks information in that agency's custody, the Court construes his complaint to allege a FOIA claim against the FBI—and no other defendant.  *See, e.g.*, *id.*

### c.    Claims Seeking Prospective Remedies

Plaintiff's remaining official-capacity claims seek prospective relief.  Specifically, Plaintiff claims that many aspects of the TSD are unlawful, and he seeks orders removing his information from it and otherwise altering its administration.  *See* Compl. ¶¶ 13, 45–46, 96–97; *id.* at 55–57, 59–67.  He also asserts that the way he has been treated while traveling violates his constitutional rights and seeks to reform those processes, including by requiring additional training of customs officers.  *See* Compl. ¶¶ 39, 42–43, 83–89; *id.* at 55–59.  Finally, he claims that he has been treated unlawfully by particular federal officers, and it is possible that he seeks orders preventing similar treatment in the future.  *See* Compl. ¶¶ 53–70, 78–82, 98.

To show standing to assert those claims, Plaintiff must establish "an ongoing or future injury that is certainly impending."  *Fuentes*, 2023 WL 1070545, at *1 (quotation omitted).  That showing could take the form of an injury that "persists and can be relieved by an appropriate court order" to a defendant.  *See Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 443 (D.C. Cir. 2020).  Or it could take the form of a "substantial probability" that a defendant will cause future injury "that the court could redress."  *See Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011) (quotation omitted).  But proving such a probability requires more than "past wrongs . . . in themselves."  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103–08 (1983).

Plaintiff has alleged ongoing injury from his inclusion in the TSD.  In *Jibril v. Mayorkas*, the Circuit held that the plaintiffs had plausibly alleged their inclusion in the TSD by noting that "SSSS" was printed on their boarding passes and that they "endured . . . extensive searches and interrogation" during a recent international trip.  20 F.4th 804, 815–16 (D.C. Cir. 2021).  It also

inferred the plaintiffs' *ongoing* inclusion in the TSD from the fact that the government had "provided no evidence to the contrary," pointing out that, at the motion-to-dismiss stage, it was obliged to make all reasonable inferences in the plaintiffs' favor. *See id.* at 816–17.

Plaintiff makes indistinguishable allegations—the inclusion of "SSSS" on his travel documents[13] and his subjection to enhanced screening. *See* Compl. ¶¶ 74, 76–77, 81–89. The government has also provided no contrary evidence. Indeed, it does not contest Plaintiff's standing to challenge his inclusion in the TSD against some defendants. *See* ECF No. 15-1 at 9–12. Thus, under *Jibril*, the Court concludes that Plaintiff has plausibly alleged that his name was included in the TSD and on the selectee list when he traveled to Spain in 2020 and that it remains there. Moreover, Plaintiff alleges that inclusion is itself illegal. He says, for example, that the dissemination of his information via the TSD harms his reputation. *See* Pl.'s Br. ¶ 15. That injury is

---

[13] The plausibility of Plaintiff's allegations is undercut by his insistence that the designation was printed on a sticker placed on his passport rather than printed on his boarding pass. In every other description the Court has seen, the latter procedure was used. *Compare* Compl. ¶ 74 *with, e.g., Jibril*, 20 F.4th at 809 ("Selectee List travelers . . . typically have 'SSSS' printed on their boarding passes . . . ."); *Maniar v. Mayorkas*, No. 19-CV-3826 (EGS), 2023 WL 2709040, at *7 (D.D.C. Mar. 30, 2023) ("When Ms. Shaikh received her boarding pass, it had an 'SSSS' notation printed on it . . . ."); *Kalu v. IRS*, No. 14-CV-998 (JEB), 2015 WL 4077756, at *1 (D.D.C. July 1, 2015) (The plaintiff "has regularly had her air travel flight boarding passes designated as Secondary Security Screening Selection (SSSS), which has required additional security measures when she travels." (quotation omitted and alterations adopted)); *Ghedi*, 16 F.4th at 460 ("According to the Government, any passenger with an 'SSSS' printed on his boarding pass must undergo enhanced screening."); *Corbett v. TSA*, 930 F.3d 1225, 1231 (11th Cir. 2019) ("When passengers are designated as selectees subject to enhanced screening . . . their boarding passes always display an 'SSSS' notation."); *Abdi v. Wray*, 942 F.3d 1019, 1023 (10th Cir. 2019) ("Abdi alleges that . . . [his] boarding pass is stamped with an 'SSSS' designation, which indicates that he is a 'known or suspected terrorist.'"); *Fikre v. FBI*, 35 F.4th 762, 768 (9th Cir. 2022) ("[T]he ticketing agent . . . stamped his boarding pass with an 'SSSS' notation, which Fikre alleges 'indicates a person's [TSD] status.'"); *Ibrahim v. DHS*, 912 F.3d 1147, 1154 (9th Cir. 2019) (The plaintiff "was issued an unusual red boarding pass with the letters 'SSSS[ ]' . . . printed on it."). Because it is conceivable that the Madrid airport used a different procedure for Plaintiff, and because the Court is obliged to draw all reasonable inferences in Plaintiff's favor, it will assume the form of the "SSSS" designation Plaintiff describes has the same meaning as the analogous procedure described in other cases.

constitutionally concrete because it "bears a sufficiently close relationship to the harm from a false and defamatory statement." *See TransUnion*, 141 S. Ct. at 2209.

Plaintiff has also alleged a substantial probability that he will experience travel-related delays again. In *Jibril*, the Circuit concluded that the plaintiffs' "history of traveling . . . every two years . . . , combined with their professed desire to continue that pattern, strongly suggest[ed] that they [would] travel internationally within the next year or two." *See* 20 F.4th at 137. It also cited *Ghedi* approvingly, *see id.*, where the Fifth Circuit observed that a Plaintiff challenging his inclusion on the selectee list had alleged "both a professional need for habitual travel and that his injuries are tied to the act of flying," 16 F.4th at 465 (emphasis omitted). Both courts thus concluded that the plaintiffs had alleged substantially probable future injuries from travel delays. *See Jibril*, 20 F.4th at 817; *Ghedi*, 16 F.4th at 465.

Again, Plaintiff's allegations are alike. Plaintiff says detention and delays such as those described here happen "every time [he] returns to the United States from international travel." Compl. ¶ 83. And although he has not pleaded much specificity, he says he must "travel to Saudi Arabia to perform religious practices." Pl.'s Br. ¶ 94. On the liberal construction due Plaintiff's pro se pleadings, the Court understands him to mean that he often travels internationally and suffers delays each time he does. So he has alleged cognizable future injuries.

But Plaintiff's successful allegations of injury-in-fact do not complete the inquiry because he must also show causation and redressability. *See Jibril*, 20 F.4th at 817. To satisfy those elements for his TSD-related claims, Plaintiff must sue a defendant with the ability to remove his name from the TSD. *See Ege v. DHS*, 784 F.3d 791, 795–97 (D.C. Cir. 2015) (dismissing a similar suit against DHS and the TSA because those agencies then "ha[d] no authority to decide whose

name goes on the No–Fly List" (quotation omitted)).[14]  Strictly speaking, that is the TSC, which

acts on mere recommendations from the FBI and National Counterterrorism Center.  *See Beydoun*

*v. Sessions*, 871 F.3d 459, 463 (6th Cir. 2017).[15]

But an FBI recommendation is likely to at least influence the TSC's decision—the FBI

"administers" the TSC, ECF No. 15-1 at 10.[16]  Besides, Plaintiff challenges other aspects of the

TSD's administration, such as the use of the word "terrorist" in its name.  *See* Compl. at 66.  For

those reasons, a Court order requiring the FBI to act can "substantially redress [Plaintiff's] injury."

*See Swan*, 100 F.3d at 980.  Redressability, particularly at the motion-to-dismiss stage, is not dis-

pelled merely because the Court appears unable to provide "'as complete a remedy' as conceivably

possible."  *See Stirrup v. Biden*, No. 21-CV-1893 (TJK), 2023 WL 2585822, at *7–8 (D.D.C.

Mar. 21, 2023) (quoting *Swan*, 100 F.3d at 980)).  Because the TSC can remove Plaintiff's name

from the TSD, and the FBI can influence that decision and other challenged aspects of TSD ad-

ministration, those agencies can give Plaintiff substantial relief, and so Plaintiff can bring his TSD-

related claims against Defendants Kable and Wray, the relevant agency heads.

---

[14] *But see Busic*, 62 F.4th at 549 (reaching the opposite conclusion after noting that "[u]nder the TSA's current procedures, . . . the TSA Administrator is tasked with issuing a final order maintaining or removing a traveler from the No Fly List" (quotation omitted and alterations adopted)).

[15] The Court assumes, based on the lack of any contrary information, that the procedural reorganization affecting the no-fly list did not alter the TSC's exclusive ability to remove names from the TSD or the selectee list.  No court appears to have explicitly addressed that question, and the government here represents that TSC, "which the FBI administers, 'is the sole entity with the authority to remove names from' the [TSD]."  ECF No. 15-1 at 10 (quoting *Ege*, 784 F.3d at 793 (alteration adopted); *see also* ECF No. 19-1 at 5 ("The TSC is the only agency authorized to cancel a record for an individual who is a known or suspected terrorist subject.").

[16] *Cf. Citizens for Resp. & Ethics in Wash. v. SEC*, 858 F. Supp. 2d 51, 61 (D.D.C. 2012) (rejecting the argument that the exclusive legal authority of the Attorney General, a nonparty, defeated redressability after noting that the "[c]omplaint does not seek an order . . . requiring the Attorney General to undertake a specific action . . . [but an] order requiring the *Defendants to ask* the Attorney General to initiate legal action").

Plaintiff has also pleaded causation and redressability for his travel-delay-related claims against Defendants Miller and Mayorkas.  As for Defendant Miller, Plaintiff attributes the delays and poor treatment he experiences from customs officers to the inadequate training of U.S. Customs and Border Protection.  *See* Compl. ¶ 88.  He also says his inquiry with DHS's TRIP program failed to resolve those problems because it "provides insufficient processes."  *See* Compl. ¶ 85.  Thus, part of Plaintiff's alleged risk of future injuries is attributable to the agencies those defendants lead, and a court order directing reform to those policies would substantially redress that harm by reducing that risk.

Plaintiff's remaining official-capacity claims present a different story.  Although he describes prior interactions with at least some of the non-agency-head defendants[17] and other agencies and agency heads not already discussed,[18] he provides no basis for inferring a substantial probability of future injury at their hands.  For some such defendants—Special Agent Keller, the anonymous air marshal, and the DVA administrators—Plaintiff's relevant interactions appear to have been the product of chance, and so the idea that Plaintiff will again experience similar problems with the same people is nothing more than speculation.[19]  As for the military defendants, Plaintiff has not been in the military for over two decades.  *See* Compl. ¶ 15.  Thus, concerning the remaining defendants, Plaintiff has "said nothing to indicate that future violation of his rights is even remotely probable."  *See Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,

---

[17] That is, Defendants Banning, Davis, Keller, Burke, Francis-Abdullah, the anonymous special agent for the Naval Criminal Investigative Service, and the anonymous air marshal.

[18] That is, Defendant Austin in his capacity as Defense Secretary and the U.S. Army's Criminal Investigation Division.

[19] If a court "can only speculate" about whether and how an injury will occur, that is "ordinarily fatal to standing."  *See Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017).

28 F.3d 1268, 1274 (D.C. Cir. 1994).  The Court will dismiss those claims for lack of standing.

### 2.     The Court Has Subject-Matter Jurisdiction over the Damages Claims Against Individual-Capacity Defendants

Finally, the Court arrives at Plaintiff's individual-capacity claims.  Plaintiff belatedly explains that he intended to assert an individual-capacity claim against each eligible defendant.  *See* Pl.'s Br. ¶ 10.[20]  The Court has subject-matter jurisdiction over those claims.

In extremely limited circumstances, a plaintiff may assert damages claims against federal officers in their individual capacities.  *See generally Hernandez v. Mesa*, 140 S. Ct. 735, 741–43 (2020).  Such claims are called *Bivens* claims after *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  *Bivens* claims do not "implicate the government's sovereign immunity."  *Doe v. Sessions*, No. 18-CV-4 (RC), 2018 WL 6530554, at *2 (D.D.C. Dec. 12, 2018).  And because they are damages claims, they do not require plausible allegations of future harm.  *See Lyons*, 461 U.S. at 105.  Thus, even an inadequately pleaded *Bivens* claim based on concrete harms lies within the Court's jurisdiction; the appropriate disposition is a dismissal on the merits.  *See, e.g.*, *Kim v. United States*, 632 F.3d 713, 720 (D.C. Cir. 2011) (dismissing damages claims against official-capacity defendants for lack of subject-matter jurisdiction and against individual-capacity defendants for failure to state a claim).  Accordingly, the Court will address whether Plaintiff's individual-capacity claims are adequately pleaded.

*        *        *

For the above reasons, the Court has subject-matter jurisdiction over the following claims: (1) damages claims against the individual-capacity defendants; (2) constitutional claims under the

---

[20] Plaintiff's complaint suggests otherwise.  *See* Compl. ¶¶ 17–28.

Fourth, Fifth, and Eighth Amendments[21] seeking prospective relief against Defendants Kable, Wray, Miller, and Mayorkas; (3) FCRA claims for damages against all defendants; (4) any APA claims Plaintiff intended to assert that seek prospective relief—except, as the Court will explain further below, a claim that DHS unreasonably delayed in responding to his TRIP inquiry; (5) and a FOIA claim against the FBI.

### B.      Plaintiff Has Not Stated a Claim Within the Court's Jurisdiction

For the following reasons, however, Plaintiff's filings fail to plausibly plead any of those claims, even when liberally construed.  Thus, the Court will dismiss Plaintiff's complaint on the merits insofar as it has subject-matter jurisdiction.

### 1.      Special Factors Counsel Against Recognizing a *Bivens* Action

Defendants do not respond to Plaintiff's *Bivens* claims on the merits.  At first, that was because they did not understand Plaintiff to make such claims.  *See* ECF No. 15-1 at 10.  After Plaintiff made his intentions clearer in his response to Defendants' motion to dismiss, *see* Pl.'s Br. ¶ 10, Defendants argued that Plaintiff has not served at least one individual-capacity defendant according to Federal Rule of Civil Procedure 4(i)(3), *see* ECF No. 21 at 2 n.3.  Although Defendants do not extend that argument further, the basis for it appears to cover each individual-capacity

---

21 Plaintiff mentions the Fourteenth Amendment as well, *see* Compl. ¶ 1, but because the Court has jurisdiction over his complaint only insofar as it asserts claims against federal officers and agencies, the Court will construe any Fourteenth Amendment claim as having been brought under the Fifth Amendment.  *See, e.g.*, *Washburn v. OPM*, No. 21-CV-1281 (TJK), 2023 WL 2478160, at *5 n.6 (D.D.C. Mar. 11, 2023).  That is true even for what the Court construes as Plaintiff's equal-protection claim.  Although the mandate not to "deny to any person within its jurisdiction the equal protection of the laws" appears in the text of the Fourteenth Amendment, it applies to the federal government via the Fifth Amendment under the doctrine known as "reverse incorporation."  *See Huthnance v. District of Columbia*, 793 F. Supp. 3d 183, 202 (D.D.C. 2011); *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954).

defendant equally.  *See generally* ECF Nos. 6–7 (Plaintiff's proofs of service).[22]

But the Court does not need to reach that argument because it will dismiss Plaintiff's individual-capacity claims sua sponte for failure to state a claim.  In most cases, dismissal for failure to state a claim is appropriate only after the opposing party moves to dismiss.  *See Bauer v. Marmara*, 942 F. Supp. 2d 31, 37 (D.D.C. 2013).  But an exception to that principle is "well settled." *Jahangiri v. U.S. Dep't of State*, No. 23-CV-1487 (CKK), 2023 WL 5174305, at *1 (D.D.C. Aug. 11, 2023).  That is, sua sponte "dismissal is appropriate if it is 'patently obvious' that [a] [p]laintiff cannot 'prevail on the facts alleged in [his] complaint.'"  *Ferguson v. McDonough*, No. 22-CV-1302 (TJK), 2022 WL 17668792, at *1 (D.D.C. Dec. 14, 2022) (quoting *Baker v. Director*, 916 F.2d 725, 726–27 (D.C. Cir. 1990) (per curiam)) (alteration adopted).  A patent pleading defect is present "when the established law plainly prohibits [the] kind of suit" a plaintiff filed.  *See Jeffries v. District of Columbia*, 916 F. Supp. 2d 42, 47 (D.D.C. 2013).

Established law plainly prohibits a claim "absent a viable cause of action."  *See, e.g.*, *Bauer*, 942 F. Supp. 2d at 37–43.  That is the nature of the *Bivens* inquiry.  The Constitution does not expressly create "a private right of action against federal officers," and Congress has not enacted one—in *Bivens* and related cases, the Supreme Court created "an otherwise nonexistent cause of action."  *See generally Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66–70 (2001).  So if a plaintiff's claim does not fit in that context, he lacks a cause of action.  *See, e.g.*, *Egbert v. Boule*, 142 S. Ct. 1793, 1807–09 (2022).  Thus, where a claim plainly cannot fit within the *Bivens* framework, sua sponte dismissal is appropriate.  *See, e.g.*, *Ferguson*, 2022 WL 17668792, at *4.

Plaintiff's claim plainly clashes with the *Bivens* framework.  That framework has two parts. First, the Court must ask whether the claim "arises in a new context or involves a new category of

---

[22] Defendants' counsel represent only official-capacity defendants.  ECF No. 21 at 2 n.3.

defendants." *See Hernandez*, 140 S. Ct. at 743 (quotations omitted).  If so, it asks the second question whether any "special factors . . . counsel hesitation" in extending *Bivens*.  *See id.* (quotation omitted and alteration adopted).  If the answer to both questions is yes, the Court must not recognize the cause of action.  *See id.*  Here, the answer to both questions is yes.

None of Plaintiff's claims resembles a previously recognized *Bivens* context.  The Supreme Court[23] has recognized a *Bivens* action in only three contexts: a Fourth Amendment claim against officers who allegedly entered the plaintiff's apartment without a warrant, manacled him in view of his family, threatened to arrest his family, and arrested him for drug-related crimes;[24] a Fifth Amendment claim for sex discrimination in employment,[25] and an Eighth Amendment claim for inadequate medical care of prisoners.[26]  Plaintiff's claims under other legal authorities categorically are new contexts.  *See Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 30 (D.D.C. 2021) ("The plaintiffs' First Amendment claim arises in a new context because the Supreme Court has never extended *Bivens* to a claim brought under the First Amendment.").  And although he brings Fourth and Eighth Amendment claims, he asserts those against "new categor[ies] of defendants," *Hernandez*, 140 S. Ct. at 743 (quotation omitted)—agency heads, military officers, and DVA administrators, not FBI agents or prison officials.[27]  *Compare* Compl. at 1–3 *with Bivens*,

---

[23] "[T]he new-context analysis may consider only Supreme Court decisions approving *Bivens* actions."  *Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir. 2020).

[24] *See Bivens*, 403 U.S. at 389–90.

[25] *See Davis v. Passman*, 442 U.S. 228, 248–49 (1979).

[26] *See Carlson v. Green*, 446 U.S. 14, 19–23 (1980).

[27] Insofar as Plaintiff's claim against Defendant Keller, an FBI special agent, is for an unlawful search of Plaintiff's home, *cf.* Pl.'s Br. ¶ 44, the new-context question is conceivably closer. But Plaintiff has not pleaded enough detail about that aspect of his claim for the Court to compare the allegations supporting his claim with the facts of *Bivens*.

403 U.S. at 388; *Carlson*, 446 U.S. at 16.  So the Court proceeds to the special-factors analysis.

Special factors abound here, but one predominates.  The purpose of recognizing an implied cause of action is "is to deter individual federal officers from committing constitutional violations." *Malesko*, 534 U.S. at 70.  But some subjects are categorically inappropriate for such judicial forays into policymaking.  So "a *Bivens* cause of action may not lie where . . . national security is at issue." *Boule*, 142 S. Ct. at 1805.  That is unquestionably true for each of Plaintiff's claims.  At the heart of each of them is the role of the TSD in screening travelers to the United States, and others implicate, for example, customs officers' procedures for the same and the administration of military justice.  Plaintiff's individual-capacity claims, in other words, could "'alter the framework established by the political branches' for handling cases with possible national security implications." *See Buchanan v. Barr*, 71 F.4th 1003, 1009 (D.C. Cir. 2023) (quoting *Hernandez*, 140 S. Ct. at 746).  Thus, national security is a special factor here.

No further analysis is appropriate.  "[T]he presence of one special factor is sufficient to preclude" recognition of a *Bivens* cause of action.  *Buchanan*, 71 F.4th at 1010.  Accordingly, the Court will dismiss Plaintiff's complaint sua sponte insofar as it alleges individual-capacity claims.

### 2.    Plaintiff Has Not Pleaded a Constitutional Violation

Returning now to Defendants' motion to dismiss, Defendants argue that Plaintiff has failed to state claims under the Fourth, Fifth, or Eighth Amendments against Defendants Kable, Wray, Miller, or Mayorkas.  *See* ECF No. 15-1 at 12–29.  For the following reasons, the Court agrees.

### a.    Unreasonable Searches or Seizures

Plaintiff's unreasonable-search-and-seizure claims appear to be based on the idea that delays he faced while traveling violate his Fourth Amendment rights.  He describes, for example, having to submit to a search of "his body and belongings" in the Madrid airport.  *See* Compl. ¶ 76.  And he notes that, while waiting in customs, his "free movement" is "block[ed]." *See* Compl.

¶¶ 88–89.  He also claims the Fourth Amendment has something to do with his inability to "access . . . medical treatment."  *See* Compl. at 55.

Those allegations categorically cannot support a Fourth Amendment claim.  "The Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985).  Thus, "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant."  *Id.*  Such a routine search can include even the "removal, disassembly, and reassembly of [an automobile's] fuel tank."  *See United States v. Flores-Montano*, 541 U.S. 149, 154 (2004).  Without some reason to think that a search is so "highly intrusive [that it] pose[s] serious threats to the dignity and privacy interests of the person being searched," a search is routine.  *See United States v. Aleman-Figuereo*, 117 F. App'x 208, 211 (3d Cir. 2004) (collecting cases).  And a few hours' delay "at international borders [is] to be expected."  *See Flores-Montano*, 541 U.S. at 155 n.3.

Plaintiff describes ordinary airport searches and delays.  At worst, he says his "belongings were taken from him and dumped on table and floor [*sic*]."  Compl. ¶ 77.  That sort of search pales in comparison to the types the Supreme Court has identified as nonroutine: "strip, body cavity, or involuntary x-ray searches" and prolonged detention in hopes of forcing a traveler to reveal contraband smuggled "in her alimentary canal."  *See Montoya de Hernandez*, 473 U.S. at 541 & n.4.  Moreover, Plaintiff provides no reason to think he faced an unusually long delay—he says only that he waited "hours."  *See* Compl. ¶¶ 86, 88 (emphasis omitted).

Accordingly, Plaintiff has failed to plausibly allege that the delays and searches he describes were unreasonable even if unsupported by particularized suspicion.  And even if his access to medical treatment has some bearing on whether he has stated a Fourth Amendment claim, his

filings do not even hint at the factual basis for his mentioning a "denial of medical treatment," *see* Compl. at 56.  For those reasons, the Court will grant Defendants' motion to dismiss Plaintiff's complaint insofar as it asserts Fourth Amendment claims.

### b.   Due Process

Plaintiff's second constitutional claim is that his inclusion in the TSD and on the selectee list violates his due-process rights.  *See* Compl. at 59, 65.  In this respect, Plaintiff's complaint most closely tracks the cases he attached to and references throughout his filings.[28]  Although those cases and others recognize the possibility that the government can violate the Due Process Clause when including someone in the TSD or on the selectee list, they also explain why Plaintiff has failed to state such a claim.

The elements of a due-process claim are: "(i) deprivation of a protected liberty interest or property interest; (ii) by the government; (iii) without the process that is 'due' under the Fifth Amendment." *N.B. ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015).  The first element is a threshold question.  The Court must find "the deprivation of a protected interest" before it can ask whether the "government's procedures comport with due process." *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (quotation omitted and alteration adopted).[29]

---

[28] He relies specifically on *Elhady v. Kable*, 993 F.3d 208 (4th Cir. 2021), ECF No. 1-1 at 34–72; *Ghedi v. Mayorkas*, 16 F.4th 456 (5th Cir. 2021), Pl.'s Br. ¶ 8; *Abdi v. Wray*, 942 F.3d 1019 (10th Cir. 2019), Pl.'s Br. ¶ 23; *Beydoun v. Sessions*, 871 F.3d 459 (6th Cir. 2017), Pl.'s Br. ¶ 4; *El Ali v. Barr*, 473 F. Supp. 3d 479 (D. Md. 2020), Pl.'s Br. ¶ 95; *Salloum v. Kable*, No. 19-CV-13505, 2020 WL 7480549 (E.D. Mich. Dec. 18, 2020), Compl. ¶ 12; and *Ibrahim v. DHS*, 62 F. Supp. 3d 909 (N.D. Cal. 2014), Pl.'s Br. ¶¶ 26–27, 73.

[29] Plaintiff appears to have pleaded both procedural- and substantive-due-process claims. *See* Compl. ¶ 9.  But that distinction does not matter here because the threshold element of both claims is the deprivation of a protected interest.  *See Gen. Elec. Co.*, 610 F.3d at 117 (procedural); *Fraternal Ord. of Police v. District of Columbia*, 502 F. Supp. 3d 45, 60 (D.D.C. 2020) (substantive), *aff'd*, 45 F.4th 954 (D.C. Cir. 2022).

Plaintiff's claims falter at that threshold.  He has not identified the deprivation of any constitutionally protected interest.  A liberal construction of his filings reveals four candidates: (1) the right to travel internationally; (2) injury to his reputation; (3) miscellaneous harm from a continuing stigma; and (4) his inability to eat at the Burger King in the Madrid airport.  For the following reasons, none of those candidates is adequately pleaded.

First, Plaintiff has not alleged that he cannot travel internationally.  At most, he has explained that when he travels internationally he faces delays longer than those faced by other travelers.  As the Fourth Circuit has persuasively explained, any right to international travel does not include the right to be "free from screening and delays at the border." *Elhady*, 993 F.3d at 219–24.  That conclusion accords with the weight of authority, which establishes that travel delays resulting from inclusion on the selectee list "do not substantially interfere with [the] ability to travel." *Abdi*, 942 F.3d at 1030–31; *see also Beydoun*, 871 F.3d at 468; *Ghedi*, 16 F.4th at 466–67.  "Thus, regardless of whether there is a constitutionally protected right or liberty interest in air travel," Plaintiff's complaint "does not implicate it." *Khalid v. Garland*, No. 21-CV-2307 (CRC), 2023 WL 2561943, at *4 (D.D.C. Mar. 16, 2023).

Second, Plaintiff has not alleged public disclosure of his TSD inclusion.  He occasionally mentions TSD-related harm to his "general reputation." *E.g.*, Compl. ¶ 14.  The Circuit has suggested that a person's reputation could be a cognizable interest supporting a due-process claim. *See Orange v. District of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995).  But such a claim requires "public disclosure of . . . allegedly [reputation-]damaging statements." *Id.*  As Plaintiff put it, information in the TSD is available to "various participating agencies," *see* Pl.'s Br. ¶ 52

(quotation omitted)," and perhaps foreign governments, *see* Compl. ¶ 71.[30]   But such disclosures are not public and so cannot support Plaintiff's claim.  *See Doe v. Cheney*, 885 F.2d 898, 910 (D.C. Cir. 1989) (distinguishing between "public[ ]" dissemination and disclosure "only to other federal agencies").   Indeed, Plaintiff acknowledges that the government has never confirmed his TSD status *even to Plaintiff himself*.  Pl.'s Br. ¶ 72.  As the Fifth Circuit put it, "secrets are not stigmas." *Ghedi*, 16 F.4th at 467.  Thus, Plaintiff has not stated a claim based on a damage-to-reputation theory.  *See, e.g.*, *Garcia v. Pompeo,* No. 18-CV-1822 (APM), 2020 WL 134865, at *6 n.2. (D.D.C. Jan. 13, 2020) (describing public disclosure as a "critical element" of such a claim).

Third, Plaintiff does not adequately allege any other concrete disability attributable to his TSD status.  This category of allegations gestures at what courts often call a "stigma-plus" theory of deprivation.  In a typical stigma-plus case, the plaintiff is a former government employee alleging wrongful termination or demotion.  *See e.g.*, *Campbell v. District of Columbia*, 894 F.3d 281, 284 (D.C. Cir. 2018); *O'Donnell v. Barry*, 148 F.3d 1126, 1140–42 (D.C. Cir. 1998); *cf. also Garcia*, 2020 WL 134865, at *6 (alleging "wrongful denial of a security clearance").  To plead such a claim, the Plaintiff must allege an "adverse action[ ] that create[d] a stigma or other disability that foreclosed the plaintiff's freedom to take advantage of other employment opportunities." *Campbell*, 894 F.3d at 284 (quotation omitted and alteration adopted).  That is, such a claim requires a government-created stigma *plus* some concrete attendant consequence—a "tangible change in status."  *See Garcia*, 2020 WL 134865, at *6 (quotation omitted).

Some courts have applied that analysis to TSD-related claims.  In *Elhady*, for example, the

---

[30] Plaintiff's opaque references to a possible data breach do not constitute an allegation of public disclosure.  That is because he never says anyone accessed his information.  Indeed, he stops short of alleging that hackers saw *anyone*'s information.  *See* Pl.'s Br. ¶¶ 87–88 (calling it unclear "whether any unauthorized parties accessed" TSD information (quotation omitted)).

Fourth Circuit considered whether the plaintiffs had alleged their TSD inclusion "altered their legal status or extinguished rights." 993 F.3d at 226. But it rejected that theory's application in that case, observing the lack of evidence of "inability to gain employment, obtain permits or licenses, or acquire firearms . . . *because* of [TSD] status." *See id.* at 227. Judge Cooper also recently pointed to allegations that TSD inclusion had tangibly harmed a plaintiff by "indefinitely delaying or denying immigration benefits and [denying him] employment opportunities" in ordering further briefing on a similar motion to dismiss. *See Khalid*, 2023 WL 2561943, at *5 (quotation omitted).

Plaintiff's allegations, however, fall short of what a stigma-plus theory requires. He explains, apparently as a general matter, that inclusion in the TSD augurs sweeping catastrophe throughout one's life. *See* Compl. ¶¶ 37–39. The most specific examples he provides are "being ghosted on entitlements" and being denied "checking accounts and banking functions." *See* Compl. ¶ 39. But he never says those things happened to *him*. And if they did, he does not provide enough "factual content" for the Court "to draw the reasonable inference" that his inclusion in the TSD was responsible. *See Iqbal*, 556 U.S. at 678. He also suggests that his TSD status might have motivated the treatment he complains of in his Eastern District of New York case. *See* Compl. ¶ 99. But without any factual allegations here to support that claim, that suggestion is utterly "conclusory" and does not make his claim plausible. *See Iqbal*, 556 U.S. at 678.

Careful review of Plaintiff's filings reveals only one specific attribution of personal, non-travel-related harm to inclusion in the TSD—but Plaintiff did not provide enough information about it. Plaintiff says a DVA administrator "used words in the database" to deny him "entitlements after finding him entitled." Compl. ¶ 125. Liberally construed, that is, his inclusion in the TSD made him ineligible for veterans' benefits. *See also* Pl.'s Br. ¶ 16. But Plaintiff does not explain the factual basis for his perception that the DVA found him otherwise "entitled" to some

benefit.  For example, he does not allege that he ever received veterans' benefits before his inclusion in the TSD.

That deficit matters because Plaintiff must plead that he experienced a "*change* in status." *See Garcia*, 2020 WL 134865, at *6 (quotation omitted and emphasis added).  His vague reference to the DVA's "finding him entitled" could mean many things other than that the DVA actually assessed whether Plaintiff met all the criteria for veterans' benefits and formally concluded that, but for his inclusion in the TSD, he should receive benefits.  Without such a conclusive determination, or facts from which one can be inferred, the Court lacks a baseline from which to find a change in status.[31]  So Plaintiff has not alleged a stigma-plus claim.

Fourth, and finally, the ability to eat a specific fast-food item at a preferred time is not a "protected liberty interest."  Compl. ¶ 82.  The Due Process Clause protects "fundamental liberty interest[s]"—those deeply rooted in the country's history and tradition.  *See Colindres v. U.S.*

---

[31] Lurking behind this pleading deficiency is the question whether the Court could, even with more detailed allegations, find a stigma-plus allegation sufficiently pleaded based on a change of status regarding veterans' benefits.  There is some reason to doubt it could, at least in some situations, given the limits on its jurisdiction.  As explained above, exclusive jurisdiction to decide Plaintiff's eligibility for veterans' benefits is vested elsewhere.  *See Price*, 228 F.3d at 422.  More specifically, the Court may not decide that a person is eligible for benefits if the DVA has already decided the opposite.  *See Broudy v. Mather*, 460 F.3d 106, 114 (D.C. Cir. 2006).  Even so, that rule does not prevent the Court from passing on an issue that the DVA has "never considered or decided."  *See id.* at 115.  Thus, depending on what the DVA has decided about Plaintiff's status—especially if the DVA has decided that Plaintiff is ineligible for benefits because of his TSD status but has *not* decided whether he would be eligible *but for* that status—the Court's ability to adjudicate the issue could run into the limits on its jurisdiction.

Perhaps because Plaintiff's allegations on this point are so sparse, Defendants do not precisely address the scope of the Court's jurisdiction to consider alleged harms arising from the denial of his veterans' benefits.  They say only that "benefits issues are not properly before this Court."  ECF No. 15-1 at 23.  Because of the factual deficiency explained above, the Court agrees.  For the same reason, the Court does not resolve the potential jurisdictional question.  Still, as explained further below, the Court will permit Plaintiff to move for leave to amend his complaint, so the Court may need to confront this question later on.

*Dep't of State*, 71 F.4th 1018, 1022 (D.C. Cir. 2023).  Plaintiff demeans the Constitution, the Court,

and his case by arguing, seriously or otherwise, that his desire for "crispy potato wedges" falls into

that category.  Compl. ¶ 82.  At most, the inability to have it his way is a "minor burden[ ]" on any

"right to travel" Plaintiff might have—and so "do[es] not rise to the level of constitutional con-

cern."  *See Elhady*, 993 F.3d at 219–22 (quotation omitted).

For those reasons, Plaintiff's due-process claims are non-starters, at least as pleaded.  Be-

cause he has not alleged any cognizable deprivation of a protected interest, the Court will dismiss

his complaint insofar as it asserts due-process claims.

### c.      Equal Protection

Plaintiff's third constitutional claim is—at least arguably—an equal-protection claim.  He

does not mention that legal theory, but he does repeatedly reference the role he thinks "race, eth-

nicity, country of origin, religion, religious practices, languages spoken, family, mere associations,

travel history, and social media history" play in TSD inclusion.  *See* Compl. ¶ 96; *see also, e.g.*,

Compl. ¶¶ 34–35, 116; Pl.'s Br. ¶¶ 43, 95.  To the extent he intended to assert such a claim, he has

not plausibly pleaded it.

Plaintiff has not alleged that the TSC expressly discriminates based on any protected cate-

gory.  He thus challenges facially neutral government action and must "plead . . . that [Defendants]

acted with discriminatory purpose."  *Iqbal*, 556 U.S. at 676.  That requires more than a bare attrib-

ution—namely, "circumstantial or direct evidence of intent."  *See Ekwem v. Fenty*, 666 F. Supp.

2d 71, 78 (D.D.C. 2009) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S.

252, 266 (1977)).  The evidence must plausibly imply "more than intent as volition or intent as

awareness of consequences."  *Iqbal*, 556 U.S. at 676.  The relevant intent for pleading an equal-

protection claim is that Defendants treated Plaintiff differently "for the purpose of discriminating

on account of race, religion, or national origin."  *See id.* at 677.

Plaintiff's complaint could be read to attribute to Defendants a discriminatory motive.  But he does not plead any evidence for that conclusion.  Indeed, he says nothing coherent about how he ended up in the TSD at all.  At times, he appears to suggest his former military commanders are responsible.  *See* Compl. ¶¶ 19, 21, 70.  And as to them, he at least alleges comments suggesting racial, ethnic, and religious animus.  *See generally* Compl. ¶¶ 55–59, 61.  But allegations of their involvement (if that is even what Plaintiff meant) are not plausible and so cannot be credited.  *See Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense.").  Plaintiff himself acknowledges that only the TSC—an entity with which he has never alleged Defendants Banning and Davis are affiliated—can enter, modify, or remove a person's file in the TSD.  *See* Pl.'s Br. ¶ 35.  As to that agency, Plaintiff says nothing about intent.

Thus, Plaintiff "alleges no facts to support his claim . . . [regarding] a . . . discriminatory policy or practice."  *Ekwem*, 666 F. Supp. 2d at 79 (quotation omitted and alteration adopted).  So the Court must dismiss his complaint insofar as it asserts an equal-protection claim.

### d.     Excessive Punishment

Plaintiff's final constitutional claim is for cruel and unusual punishment.  *See* Compl. at 57–58.  But that provision of the Eighth Amendment applies "only to persons who are subject to 'punishment' by the government, which the Supreme Court has defined to mean persons against whom the government 'has secured a formal adjudication of guilt in accordance with due process of law.'"  *Powers-Bunce v. District of Columbia*, 479 F. Supp. 2d 146, 153 (D.D.C. 2007) (quoting *Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1979)).  The Court has already disposed of Plaintiff's complaint insofar as it relates to his interactions with the military justice system.  Thus, none of his allegations could even arguably satisfy that threshold element of an Eighth Amendment claim, and so the Court will dismiss his complaint in this respect.

### 3. Plaintiff Has Not Pleaded a Statutory Violation

For Plaintiff's statutory claims, which arise under the FCRA, the APA, and FOIA, the story is the same. Defendants argue that Plaintiff has failed to state claims. *See* ECF No. 15-1 at 29–32. For the following reasons, the Court agrees.

### a. The FCRA

Of Plaintiff's allegations the Court construes as statutory claims, his claims under the FCRA are by far the most clearly stated. He says he spent years working in the "credit repair" industry and thus formed opinions about the legal framework surrounding such work. *See generally* Compl. ¶¶ 108–16. His complaint mentions several provisions of the FCRA. *See, e.g.*, Compl. ¶ 97 (15 U.S.C. §§ 1681a(3)(A), 1681i); Compl. at 59–60 (15 U.S.C. §§ 1681f, 1681n); Compl. at 62 (15 U.S.C. §§ 1681u, 1681j); Compl. at 63 (15 U.S.C. § 1681i).

Those claims all suffer from the same threshold defect. As relevant here, the FCRA applies only to a "consumer reporting agency" or information provided by the same. 15 U.S.C. §§ 1681f, 1681i, 1681j, 1681n(b), 1681u; *see also Mowrer*, 14 F.4th at 731 (describing the requirements "[t]o qualify as a 'consumer reporting agency' regulated by [the] FCRA"). The FCRA also defines a "consumer reporting agency" as an entity that regularly assembles or evaluates certain information "for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). A consumer report, in turn, "is used or expected to be used or collected . . . for the purpose of serving as a factor in establishing the consumer's eligibility" for enumerated financial purposes. *See id.* §§ 1681(a)(d), 1681b. Based on the former definition, the Circuit recently concluded that a federal agency is not subject to the FCRA because it assembled and disseminated the challenged information "to support safety regulatory and enforcement activities"—not for any purpose enumerated in the FCRA. *See Mowrer*, 14 F.4th at 731.

For essentially the same reason, no defendant here is a consumer reporting agency. True,

Plaintiff says otherwise.  He claims the TSD's "purpose is to assemble and evaluate consumer information for consumer reports."  Pl.'s Br. ¶ 53; *see also* Pl.'s Br. ¶¶ 11–12, 55, 59, 62 n.7, 63. But the Court need not credit those allegations, which are no more than "threadbare recitals of the elements of a cause of action."  *See Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678) (alteration adopted).  And they defy "common sense" besides.  *See Iqbal*, 556 U.S. at 679.  Plaintiff's claim asks the Court to accept that the Terrorist Screening Center, administered by the Federal Bureau of Investigation, exists primarily to help third parties decide whether to loan someone money or to underwrite their insurance policy, 15 U.S.C. § 1681a(d)(1)(A), to hire someone, *see id.* § 1681a(d)(1)(B), or otherwise to support third parties' "legitimate business need[s]," *see id.* § 1681b(a)(3)(F).  The Court is unconvinced.

Contrary statements abound in the caselaw—and in Plaintiff's filings.  The TSD's raison d'être is "federal law enforcement."  *See Elhady*, 993 F.3d at 225; *accord Abdi*, 942 F.3d at 1027 (The TSD exists "to protect against terrorism." (quotation omitted)); *Ghedi*, 16 F.4th at 460 (The TSC maintains the TSD to "aid in positively identifying known or suspected terrorists who are attempting to enter the country[ ] or board an aircraft." (quotation omitted and alterations adopted)); *El Ali*, 473 F. Supp. 3d at 493 (The TSC was created to "consolidate the government's approach to terrorism screening."); *Ibrahim*, 62 F. Supp. 3d at 918 (The TSD "provide[s] information to the United States intelligence community.").  Even Plaintiff alleges that the TSD exists to "consolidate the Government's approach to terrorism screening and provide for the . . . use of Terrorist Information in screening processes."  *See* Compl. ¶ 90.  And again, the intention to use information for federal law enforcement—even if one also discloses the information to third parties—does not qualify one as a consumer reporting agency under the FCRA.  *See Mowrer*, 14 F.4th at 731 (observing that the defendant agency "assembles . . . records . . . to support safety

regulatory and enforcement activities," not to "make such records available to prospective employers," even though a statute requires it also to do the latter (quotation omitted)).

Thus, even if TSD information is as widely disseminated as Plaintiff represents, the government's compilation and use of that information is not subject to the FCRA. So Plaintiff has not stated a FCRA claim against any defendant, and the Court will dismiss his complaint insofar as it asserts such claims.

### b.    The APA

Plaintiff may have meant to assert an APA claim. He says the APA creates "a non-discretionary duty to conclude agency matters," Pl.'s Br. ¶ 82, and points to this Court's authority to "compel agency action unlawfully withheld or unreasonably delayed," Pl.'s Br. ¶ 83 (quoting 5 U.S.C. § 706(1)). Insofar as Plaintiff seeks to compel agency action for the reasons stated in his other claims, any APA claim is duplicative and should be dismissed for that reason. *See, e.g.*, *Lewis v. Pension Benefit Guar. Corp.*, 314 F. Supp. 3d 135, 141 n.1 (D.D.C. 2018), *aff'd*, 831 F. App'x 523 (D.C. Cir. 2020). But Plaintiff also suggests that his TRIP inquiry was never adequately resolved. *See, e.g.*, Pl.'s Br. ¶ 74. Thus, he may seek to compel action on that inquiry.

In very limited circumstances, federal courts have mandamus authority to order agencies to render a final decision. *See generally Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79–81 (D.C. Cir. 1984) ("*TRAC*"). The *TRAC* standard "applies to claims of unreasonable delay under both the Mandamus Act and the APA." *Arab v. Blinken*, 600 F. Supp. 3d 59, 69 (D.D.C. 2022). In applying that standard, the Court "may not decide 'how the agency shall act.'" *See Jahangiri*, 2023 WL 5174305, at *2 (quoting *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004)) (alteration adopted). Thus, once an agency acts, an unreasonable-delay claim becomes moot. *See Potomac Elec. Power Co. v. ICC*, 702 F.2d 1026, 1035 (D.C. Cir. 1983) ("[O]nce the [agency] has rendered a final decision, the issue . . . will be moot.").

Plaintiff does not allege any ongoing failure to act on any petition or inquiry he filed.  He acknowledges that his TRIP inquiry resulted in a "den[ial of] constitutional redress."  Pl.'s Br. ¶ 74.  Thus, any unreasonable-delay claim he intended to assert is moot.

Accordingly, the Court will deny his APA claims for failure to state a claim insofar as any such claims duplicate others that the Court dismisses.  And it will deny any unreasonable-delay claim for lack of subject-matter jurisdiction.[32]

### c.      FOIA

Finally, the Court turns to Plaintiff's FOIA claim against the FBI.  Defendants correctly observe that Plaintiff has not provided enough detail about that claim, ECF No. 15-1 at 31–32, so the Court will dismiss Plaintiff's complaint in this respect too.

To state a FOIA claim, Plaintiff must allege that "an agency has (1) improperly (2) withheld (3) agency records." *Cause of Action Inst. v. IRS*, 390 F. Supp. 3d 84, 92 (D.D.C. 2019) (quotation omitted).  A request must "reasonably describe[ ] such records," 5 U.S.C. § 552(a)(3)(A)(i), meaning it "enable[s] a professional employee of the agency who [is] familiar with the subject area . . . to locate the record with a reasonable amount of effort." *Am. Ctr. for L. & Just. v. DHS*, 573 F. Supp. 3d 78, 81 (D.D.C. 2021) (quotation omitted).  The agency must be "able to determine precisely what records are being requested." *Tax Analysts v. IRS*, 117 F.3d 607, 610 (D.C. Cir. 1997) (quotation omitted).  Under that standard, courts employ a "context-specific inquiry" to decide whether a request permits "a processor to zero in on the set of documents at issue." *See Gun Owners of Am., Inc. v. FBI*, 594 F. Supp. 3d 37, 48 (D.D.C. 2022).

The Court cannot apply that standard without any allegation about what the FOIA requests

---

[32] If a claim becomes "moot because it no longer presents a live controversy, the court lacks jurisdiction to entertain the claim, and must dismiss it." *Han v. Lynch*, 223 F. Supp. 3d 95, 105 (D.D.C. 2016).

say.  Plaintiff says he "filed FOIA requests."  Compl. ¶ 98.  He also provides a series of emails that portray his arguing with an FBI representative about whether a request should be expedited. *See* ECF No. 1-1 at 134–43.

From that information, it is impossible to conclude whether the FBI "improperly" withheld any records.  *See Cause of Action Inst.*, 390 F. Supp. 3d at 92 (quotation omitted).  Thus, Plaintiff has not stated a FOIA claim, and the Court will dismiss his complaint insofar as it asserts one.

\*     \*     \*

After liberally construing Plaintiff's filings, "infer[ring] the claims made wherever possible," and seeking to identify "all possible legal theories that could apply," *see Davis*, 973 F. Supp. 2d at 26, the Court cannot cobble together enough facts to constitute a well-pleaded claim within its subject-matter jurisdiction.  So it will dismiss Plaintiff's complaint in full.

But the Court will do so without prejudice, giving Plaintiff a chance to correct his complaint's deficiencies.  The Circuit has instructed this Court to "dismiss with prejudice only if it determines the plaintiff could not possibly cure the deficiency by alleging new or additional facts." *United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 936 (D.C. Cir. 2017) (quotation omitted). Although that is probably true for most of Plaintiff's claims, the Court cannot rule out the possibility that additional facts consistent with those already pleaded could revive a few of his claims. An obvious example is his FOIA claim, which the Court dismissed because it has no information about his FOIA requests.  The Court also notes that Plaintiff alluded to miscellaneous ways in which inclusion in the TSD can affect one's life without providing any details about whether any such harms happened to him.  Thus, Plaintiff may seek leave to file an amended complaint according to the terms specified in the Court's order below.

## IV.   Conclusion and Order

For all the above reasons, it is hereby

**ORDERED** that Defendants' Amended Motion to Dismiss, ECF No. 14, is **GRANTED**. It is further

**ORDERED** that Plaintiff's complaint, ECF No. 1, is **DISMISSED WITHOUT PREJU-DICE** in part for lack of subject-matter jurisdiction, and in remaining part for failure to state a claim. It is further

**ORDERED** that Plaintiff may move for leave to file an amended complaint by October 25, 2023. If Plaintiff does not so move by that date, the Court will dismiss the case. It is further

**ORDERED** that, if Plaintiff moves for leave to file an amended complaint, he shall comply with Federal Rule of Civil Procedure 8(a), the Local Civil Rules, and the Court's Standing Order. Plaintiff is advised that Federal Rule of Civil Procedure 8(a) requires only "short and plain statement[s]" establishing the Court's jurisdiction and his entitlement to relief. The Court's opinion pointing out a lack of *pertinent* detail should not be mistaken for an invitation to multiply the considerable extraneous detail in his original complaint. Plaintiff is further advised that Local Rule 7(i) requires a motion for leave to file an amended complaint to "be accompanied by an original of the proposed pleading as amended." Plaintiff is further advised that the Court's Standing Order requires "proposed amended pleadings [to] be accompanied by a redline comparison of the original and . . . proposed pleading." *See* ECF No. 4 ¶ 7.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 25, 2023